JON L.R. DALBERG (State Bar No. 128259)
jdalberg@lgbfirm.com
RODGER LANDAU (State Bar No. 151456)
rlandau@lgbfirm.com
MONICA RIEDER (State Bar No. 263250)
mrieder@lgbfirm.com
LANDAU GOTTFRIED & BERGER LLP
1801 Century Park East, Suite 700
Los Angeles, California 90067
Telephone: (310) 557-0050
Facsimile: (310) 557-0056

Proposed Attorneys for Debtors
and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SAN FERNANDO VALLEY DIVISION

In re

KSL MEDIA, INC., T.V. 10'S, LLC, and FULCRUM 5, INC.,

Debtors.

☐ Affects KSL Media, Inc.

☐ Affects T.V. 10's, LLC

☐ Affects Fulcrum 5, Inc.

☒ Affects All Debtors

Case No.  1:13-bk-15929
Case No.  1:13-bk-15930
Case No.  1:13-bk-15931

Chapter 11

**DECLARATION OF JANET MILLER-ALLEN**

I, Janet Miller-Allen, hereby declare as follows:

1. Except as stated on information and belief, I have personal knowledge of the facts set forth herein and, if called to testify, I could and would competently testify thereto.

2. On September 11, 2013 (the "Petition Date"), KSL Media, Inc. ("KSL"), T.V. 10's, LLC ("TV10's"), and Fulcrum 5, Inc. ("Fulcrum 5," and together with KSL and TV10's, the "Debtors") filed voluntary petitions under Chapter 11 of the Bankruptcy Code.

3. I have been employed by KSL for approximately five years. During the majority of that time, I held the position of Finance Manager. I was responsible for managing the Debtors' billing, general ledger, and bank record reconciliations. Approximately one month before the Petition Date (when I was informed of the Debtors' insolvency), I was promoted to the position of Controller of each of the Debtors.

4. The sole director of KSL and Fulcrum 5 and the sole manager of TV10's have authorized me to act on behalf of those Debtors in their Chapter 11 cases. As the Controller, I will be primarily responsible for supervision of the Debtors' wind-down process.

5. The Debtors are affiliates of one another by reason of common ownership. Kalman Liebowitz owns 100% of KSL (through a holding company, KSL Media New York, Inc.), Fulcrum 5, and TV10's.

**Nature of the Debtors' Business and Relationship Between the Debtors**

6. KSL was formed in 1981. At a time when the advertising industry was largely dominated by companies that offered only "bundled" creative and media buying services, KSL was one of the first companies to offer clients stand-alone media planning and purchasing services. As of the Petition Date, KSL was one of the largest independent media buying companies in the country.

7. KSL worked with each client to develop a media buying plan that ensured maximum exposure and impact for the client's advertisements. That plan could include placement on a variety of media platforms, including television, radio, print, digital, and out-of-home (e.g., billboards or event sponsorship). KSL would then purchase the media necessary to implement the plan, either directly from the media outlet or through a vendor representative.

1

8. KSL was successful in attracting a number of high-profile clients, including City National Bank, Guitar Center, Inc., Petsmart, Toshiba America Information Systems, Inc., Frontier Communications, and Sapporo USA. KSL operated on a very large scale, buying approximately $250-$350 million of media services annually in recent years.

9. TV10's and Fulcrum 5 are much smaller companies, both of which were formed for the purpose of buying and re-selling specific types of media (TV10's buys ten-second television spots and Fulcrum 5 buys digital media). KSL is the primary customer of both TV10's and Fulcrum 5.

**Events Leading to Filing of Chapter 11 Cases**

10. Although KSL offered a unique and valuable service to an impressive array of clients, I am informed and believe that KSL's financial well-being was seriously undermined in recent years by the criminal malfeasance of the Debtor's former corporate controller, Geoffrey Charness. Mr. Charness worked for KSL between 2006 and 2010. I am informed and believe that Mr. Charness' actions have harmed the Debtor in at least three ways, leading to tens of millions of dollars in damages and losses.

11. First, I am informed and believe that Mr. Charness appears to have taken large sums of money from KSL for the personal benefit of himself and his wife during his employment. This apparent embezzlement occurred primarily through the transfer of approximately $145 million of KSL's money to credit card accounts held by Mr. Charness and his wife. While some of these transfers ultimately were routed back to pay for KSL's expenses, KSL believes that Mr. Charness and his wife used a substantial amount of these funds for their own benefit. KSL has yet to determine the total amount of money Mr. Charness and his wife diverted from KSL in this fashion.

12. KSL has filed an action against Mr. and Mrs. Charness seeking recovery of the embezzled funds. That action is pending as *KSL Media, Inc. v. Charness, et al.*, case no. LC100504, in the California Superior Court for the County of Los Angeles, Northwest District.

13. I am informed and believe that the Federal Bureau of Investigation also is engaged in an active criminal investigation of Mr. Charness based on these same activities, and that KSL

2

has been providing information to the FBI to assist in its investigation. I am informed and believe that KSL's former Chief Financial Officer, accountant, and counsel met with Agent Charles Koepke of the FBI on July 16, 2013 (at his request), to discuss the status of the investigation and ways in which KSL can further assist the FBI's efforts.

14. Second, I am informed and believe that, in furtherance of his scheme to wrongfully obtain funds from KSL, Mr. Charness failed to maintain proper financial records during his time as Controller. I am informed and believe that the result is that KSL has very poor information regarding its receipts and expenditures during the period when Mr. Charness acted as Controller. To address KSL's inability to properly evaluate its prior operations, KSL has hired Grobstein Teeple Financial Advisory Services ("GTFAS") to conduct a forensic accounting of KSL's books and records. That accounting is ongoing. In addition to clarifying KSL's financial position, KSL expects that the accounting will produce significant evidence in support of KSL's and the FBI's respective actions against Mr. Charness.

15. Third, I am informed and believe that KSL allegedly failed to accurately account for its financial transactions with one of its clients, Cumberland Packing Corp. d/b/a Sweet'N Low ("Cumberland"). I am informed and believe that a significant dispute arose which resulted in KSL and Cumberland each asserting various claims against one another. I am informed and believe that KSL ultimately determined that it could not effectively litigate those claims with Cumberland due to the accounting practices followed during Mr. Charness' tenure. I am informed and believe that, in July 2012, KSL entered into a confidential settlement agreement with Cumberland and executed a secured promissory note in Cumberland's favor for the settlement amount. KSL made the last multimillion dollar payment on the promissory note shortly before the Petition Date.

16. I am informed and believe that, while KSL's management believed that its business operations should yield a net profit, KSL has not operated profitably for a number of years, and the damage inflicted on KSL by Mr. Charness' actions was a significant cause of that unprofitability. I am informed and believe that, after Mr. Charness' departure, KSL began a process of restructuring and working to gain financial control and visibility. While KSL was engaged in that process, however, KSL's biggest client (Bacardi) ceased doing business with KSL.

I am informed and believe that the loss of the Bacardi revenue, coupled with the prior financial damage caused by Mr. Charness, rendered continued operations unviable. In hopes of minimizing or eliminating creditors' losses, KSL first explored the option of selling its business on a going concern basis to another company in the media/advertising industry. When those efforts were unsuccessful, KSL determined that the best way to maximize return to its creditors was to conduct an orderly wind-down and liquidation in a Chapter 11 case.

17. Because media purchases by KSL account for approximately 40% of the annual revenue of TV10's and 95% of the annual revenue of Fulcrum 5, TV10's and Fulcrum 5 determined that they could not operate profitably following KSL's Chapter 11 filing. Accordingly, TV10's and Fulcrum 5 determined that the best way to maximize return to their creditors was to file their own Chapter 11 cases and seek joint administration of their cases with KSL's.

**Debtors' Assets and Liabilities**

18. None of the Debtors own any real property. KSL has personal property assets of approximately $64 million, consisting primarily of approximately $32 million in cash, $31 million in accounts receivable, and $200,000 in office furniture and equipment. TV10's has personal property assets of approximately $600,000, consisting primarily of approximately $500,000 in accounts receivable (including approximately $290,000 owed by KSL). Fulcrum 5 has personal property assets of approximately $3.5 million, consisting primarily of approximately $3.3 million in accounts receivable (including approximately $3.275 million owed by KSL).

19. None of the Debtors have any secured debt. The only priority unsecured claims against the Debtors are claims by various taxing authorities—totaling approximately $40,000 for KSL, $4,000 for TV10's, and $5,000 for Fulcrum 5.

20. The Debtors are presently unable to create any accurate picture of the general unsecured claims against them. While the Debtors can estimate the total amount of their general unsecured debt (approximately $94 million for KSL, $1.7 million for TV10's, and $2 million for Fulcrum 5), the Debtors do not know (and, in fact, cannot presently know) how much of that debt is owed to clients and how much to media vendors. This uncertainty is attributable to the unique

4

nature of the media buying business.

21. Apart from payments made to KSL in compensation for KSL's services (which may be based on a flat fee, commission, or some combination of the two), virtually all of KSL's clients also make payments to KSL for the purchase of media. A few clients are invoiced by KSL and make payments to KSL only after KSL has received and reconciled final bills from the media vendors for the associated media services. In most cases, however, KSL receives estimated payments from the client before the media vendors issue bills to KSL. Accordingly, KSL cannot settle its account with the client until KSL has received final bills from the media vendors, entered the information provided by the vendors into its system, and conducted a reconciliation process between the original order placed by KSL, the services actually provided by the media vendor, and any amount of money previously paid by the client in relation to that order.

22. For example, if the media plan for a particular client called for the purchase of a total of $2 million of media for the month of May, KSL would place orders totaling that amount with a variety of media vendors for advertisements to run in May. The advertisements would run as ordered (or not) during the month of May. Sometime in May, the client would pay KSL $2 million. Subsequently, likely in June, the media vendors would compile invoices and provide them to KSL. These invoices would identify the discrepancies between the services ordered by KSL and the services actually provided. For example, KSL might have placed an order with CBS for a client's commercial to run 12 times in May during a particular CBS show, at a cost of $10,000 per run, for a total of $120,000. The invoice from CBS might indicate that the commercial only ran 11 times (because, for example, the show was pre-empted by breaking news one night), or it might indicate that it ran 13 times but three of those times were during a show with lower ratings than the show KSL had ordered. KSL would then enter into its own system the information provided by CBS regarding the services actually provided and would conduct a reconciliation process between the order placed, the services provided, and any amount of money previously paid by the client in relation to that order. If, for example, the value of the services provided by CBS during the month of May were $117,000 rather than the ordered $120,000, KSL would owe CBS $117,000 and would owe the client $3,000, because the portion of the estimated

5

1 payment made by the client in May that related to that particular order exceeded the actual liability
2 on that order by $3,000. To determine the total amount KSL owed that particular client for the
3 month of May, KSL would have to perform the same reconciliation process on the invoice of each
4 media vendor with whom KSL placed an order for the client's advertisements to run in May.
5 Prior to the Petition Date, the amount "owed" to the client would take the form of a credit on a
6 future bill. In the context of the bankruptcy case, however, the reconciliation is necessary for KSL
7 to determine the amount of the general unsecured claims held by its media vendors and clients.
8 The process of completing that reconciliation for all media orders placed by KSL for any of its
9 clients prior to the Petition Date will be time and personnel intensive.

10        23.    TV10's and Fulcrum 5 operate on a somewhat different model from KSL. They
11 buy specific quantities of media from media vendors (for example, one hundred 10-second
12 television spots from ABC during the month of May) and re-sell that media to advertisers or other
13 media buyers. The sole source of their profit is in the difference between the price at which
14 TV10's and Fulcrum 5 buy the media from the source and the price at which they re-sell it.
15 Unlike KSL, TV10's and Fulcrum 5 do not receive any prepayments from their clients. Instead,
16 their clients are billed for the re-purchased media services only after TV10's and Fulcrum 5 have
17 received and reconciled the invoices from the media vendors for those services. Therefore, the
18 reconciliation process for these two Debtors differs from KSL's in that, on the client side, the
19 process will result in the identification of receivables held by the Debtors rather than payables
20 owed by the Debtors.

21 **Post-Filing Operations**

22        24.    Upon filing their bankruptcy cases, the Debtors immediately ceased their media-
23 buying operations. The Debtors will no longer be accepting payments from clients, making
24 payments to media vendors, or placing orders for future media purchases. KSL is also filing a
25 motion to reject all of its client contracts. (With a few exceptions, TV10's and Fulcrum 5 utilize
26 one-time purchase authorizations rather than long-term contracts.)

27        25.    For the reasons set forth above, the Debtors will not be able to provide an adequate
28 accounting of the prepetition general unsecured claims against their bankruptcy estates until they

have received and reconciled all invoices from media vendors for services purchased by the Debtors. The Debtors expect to continue receiving invoices from media vendors for the next month or two (as media vendors generally bill a few weeks in arrears). Once the invoices are received, it usually takes KSL approximately three months to complete the reconciliation of all purchase orders placed for a client in a particular month. However, as of the Petition Date, KSL was approximately four months behind in performing reconciliations for certain clients. Therefore, KSL will likely need at least six months from the Petition Date to complete the entire reconciliation process. Because they have a much smaller volume of business and were generally more up-to-date on their reconciliations as of the Petition Date, TV10's and Fulcrum 5 should be able to complete their reconciliations much sooner—likely within three months after the Petition Date.

26.   The reconciliation process requires an understanding of and experience with the media buying business and the proprietary software systems used for media billing. I am informed and believe that the Debtors investigated whether there were any outside providers who could effectuate the reconciliations. Only a handful of third parties (primarily the Debtors' competitors) would even have the theoretical capacity to perform the reconciliation. Even if a third party would be willing to provide the reconciliation services on a contract basis, none of them know enough about the Debtors' business to perform the reconciliation as quickly or accurately as the Debtors. Accordingly, having the Debtors' employees perform the reconciliation process is the only viable means for accomplishing a timely and cost-effective determination of the general unsecured claims against the estates.

27.   Prior to the Petition Date, the Debtors laid off all of their employees who were not essential to the reconciliation process. For KSL, this meant closing its New York and Las Vegas offices and reducing the personnel in its Los Angeles office to 30 employees (plus a few key employees in New York who will work remotely for a brief period). TV10's and Fulcrum 5, which share office space with KSL in Los Angeles, reduced their personnel to one and five employees, respectively.

28.   In connection with the layoffs, the Debtors paid in full (a) all amounts owed to the

terminated employees, including accrued wages and accrued vacation, and (b) the claims held by the retained employees for accrued wages and vacation time through the Petition Date. The Debtors will pay the retained employees their post-petition wages in the ordinary course of business during the Chapter 11 case. These employees will also accrue post-petition sick leave and vacation time, and upon leaving the Debtors' employment (which will occur at the conclusion of the reconciliation process, if not sooner) they will receive payment for any post-petition accrued and unused vacation time.

**Proposed Chapter 11 Plan**

29.   The Debtors intend to jointly propose a liquidating plan early in the case, which will provide for the efficient and expeditious payout of creditor claims and will not include any insider releases. Under the plan, all of the Debtors' assets (consisting primarily of cash and litigation claims) will be transferred into a liquidation trust following the completion of the reconciliation process. At or around the effective date, the large majority of the Debtors' cash on hand will be distributed pro rata to holders of unsecured claims. The remaining cash will be used to fund the pursuit of litigation by the liquidating trustee, including the action against Mr. and Mrs. Charness, any claims that may exist against the Debtors' insiders, and any avoidance actions.[1]

30.   The Debtors believe that they have approximately $95 million in unsecured debt (not including intercompany claims), although the precise amount cannot be determined until the completion of the reconciliation, and the Debtors have approximately $32 million in cash on hand. Accordingly, even if the litigation yields little net recovery for the estate, the Debtors believe that creditors will obtain a significant and timely recovery from the kind of liquidating plan that the Debtors intend to propose.

**Motion for Joint Administration**

31.   I believe that it is appropriate for the Court to order joint administration of the Debtors' Chapter 11 cases for a number of reasons. As set forth above, the Debtors are affiliates of one another by reason of common ownership. The Debtors share office space, resources (such

---

[1] I am informed and believe that KSL's estate may also possess various insurance claims. These claims should be investigated and, if appropriate, pursued on behalf of the estate.

8

as software licenses), and certain employees, including myself. The Debtors also have a number of creditors in common. The Debtors were under common management prior to the Petition Date, and I have been authorized to act on behalf of all three of the Debtors in their Chapter 11 cases. All three Debtors seek to retain the same general bankruptcy counsel (Landau Gottfried & Berger LLP) and financial advisor (Grobstein Teeple Financial Advisory Services). Finally, because receivables owed by KSL are the largest assets of the bankruptcy estates of TV10's and Fulcrum 5, it would be infeasible for these Debtors to proceed with Chapter 11 plans independent of KSL.

32. For these reasons, I believe that requiring separate motions and other papers to be filed in each of the three Debtors' bankruptcy cases would cause needless expenditure of time and money. Joint administration will not impair the rights of creditors, because (a) each Debtor will maintain separate debtor-in-possession bank accounts and file individual monthly operating reports; (b) papers that must be served on "all creditors" pursuant to Federal Rule of Bankruptcy Procedure 2002 will be served on the creditors of all three Debtors; and (c) the Debtors' assets and liabilities will remain distinct unless and until the Court confirms the Debtors' joint liquidating plan.

**Motion Regarding Postpetition Utility Services**

33. The Debtors receive telephone and internet services from multiple providers (the "Utility Providers"). Attached hereto as Exhibit "1" is a list setting forth, on an account-by-account basis, the name and address of each Utility Provider, the type of utility services furnished by the Utility Provider, the Debtor's account number with the Utility Provider, and the Debtor's average monthly payment to the Utility Provider. As set forth thereon, the total monthly amount of such payments is approximately $6,200.

34. As explained above, the Debtors will continue to employ between 20 and 40 people in their Los Angeles offices for approximately six months to complete the reconciliation process necessary to liquidate the general unsecured claims against the estates. For the employees to work effectively, they will require uninterrupted services from the Utility Providers.

35. The Debtors propose to provide "adequate assurance of payment" to the Utility Providers by making cash deposits for each account in an amount equal to the Debtor's average

9

monthly payment on that account. As set forth in the Debtors' 13-week cash projections that will be filed with the Court, the Debtors have sufficient unencumbered cash to make these deposits and to continue paying the Utility Providers in the ordinary course of business throughout their Chapter 11 cases.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 10, 2013, at Los Angeles, California.



Janet Miller-Allen

10

# EXHIBIT 1

| Debtor | Utility Provider | Type of Utility | Account #'s | Monthly Payment | Address | City | State | Zip |
|---|---|---|---|---|---|---|---|---|
| KSL Media, Inc. | AT&T | Long-Distance Phone | 051-847-1539-001 | $82.95 | PO BOX 5025 | Carol Stream | IL | 60197-5025 |
| KSL Media, Inc. | AT&T | Trunk / DID Line | 171-791-45330-322 | $847.83 | PO BOX 537104 | Atlanta | GA | 30353 |
| KSL Media, Inc. | AT&T | Fax Line | 818-817-9383-343-0 | $99.48 | PO BOX 537104 | Atlanta | GA | 30353 |
| KSL Media, Inc. | AT&T | LA Land Line | 960 457-7095 555 7 | $3,011.17 | PO BOX 5025 | Carol Stream | IL | 60197-5025 |
| KSL Media Inc. | DirecTV | Cable | 046692008 | $261.98 | PO BOX 60036 | Los Angeles | CA | 90060-0036 |
| KSL Media, Inc. | Verizon | Internet (both LA & NY) | VN93175489 | $1,429.84 (LA only) | PO BOX 660794 | Dallas | TX | 75266-0794 |
| Fulcrum 5 | Ringcentral Office | VOiP | (818) 351-5107 | $451.55 | 1400 Fashion Island Blvd, Suite 700 | San Mateo | CA | 94404 |

EXHIBIT 1
11

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is:
**Landau Gottfried & Berger LLP; 1801 Century Park East, Suite 700; Los Angeles, CA 90067**

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF JANET MILLER-ALLEN** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **September 11, 2013,** I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2. SERVED BY UNITED STATES MAIL**:
On (*date*) **September 11, 2013**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____ I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 9/11/2013 | Samuel J. Colen | *(signed)* |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

F 9013-3.1.PROOF.SERVICE

1. **TO BE SERVED BY THE COURT VIA NEF**:

- Rodger M Landau    rlandau@lgbfirm.com, marizaga@lgbfirm.com;rmartin-patterson@lgbfirm.com;VEdwards@lgbfirm.com
- United States Trustee (SV)    ustpregion16.wh.ecf@usdoj.gov

2. **SERVED BY UNITED STATES MAIL**:

| | | |
|---|---|---|
| ANIMAL PLANET<br>PO BOX 79961<br>BALTIMORE, MD 21279 | HOME TEAM SPORTS<br>NATIONAL ADVERTISING PARTNERS<br>FILE #55437<br>LOS ANGELES, CA 90074-5437 | LIFETIME TV WOMEN<br>111 8TH AVE 11TH FL<br>NEW YORK, NY 10011 |
| COMEDY CENTRAL<br>PO BOX 13683<br>NEWARK, NJ 07188 | THE LEARNING CHANNEL<br>PO BOX 79961<br>BALTIMORE, MD 21279 | MACDONALD MEDIA<br>185 MADISON AVE 4TH FL<br>NEW YORK, NY 10016 |
| E! ENTERTAINMENT TV<br>PO BOX 749009<br>LOS ANGELES, CA 90074-9009 | TRAVEL CHANNEL<br>PO BOX 791027<br>BALTIMORE, MD 21279-1027 | MACDONALD MEDIA<br>185 MADISON AVENUE<br>4TH FLOOR<br>NEW YORK, NY 10016 |
| FOOD NETWORK<br>PO BOX 602-018<br>CHARLOTTE NC 28260-2018 | TURNER DIGITAL<br>PO BOX 533139<br>CHARLOTTE, NC 28290 | NBC SPORTS NETWORK<br>FILE 749052<br>LOS ANGELES, CA 90074-9052 |
| FX NETWORK<br>FILE 55115<br>LOS ANGELES, CA 90074 | USA NETWORK<br>PO BOX 402971<br>ATLANTA, GA 30384-2971 | VALASSIS<br>38905 WEST SIX MILE RD<br>LIVONIA, MI 48152 |
| GOLF CHANNEL<br>PO BOX 281401<br>ATLANTA, GA 30384-1401 | ESPN<br>13039 COLLECTIONS CTR DR<br>CHICAGO, IL 60693 | WM BARR<br>8000 CENTERVIEW PKWY<br>SUITE 400<br>Cordova, TN 38018 |
| HOME & GARDEN TV<br>PO BOX 602028<br>CHARLOTTE, NC 28260-2028 | INVENTION CHANNEL DBA<br>TELBRANDS<br>79 TWO BRIDGES RD<br>Fairfield, NJ 07004 | |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

F 9013-3.1.PROOF.SERVICE